IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SALLY BEAUTY HOLDINGS, INC., | § | |
| | § | |
| Plaintiff, | § | C.A. No. _____ |
| v. | § | |
| | § | |
| VISA INC., | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT

Plaintiff Sally Beauty Holdings, Inc. ("Sally Beauty"), by its undersigned attorneys, as and for its Complaint, alleges the following:

## NATURE OF THE ACTION

1.      Sally Beauty brings this Complaint against Defendant Visa Inc. ("Visa") to recover $14,344,740.36 in issuer reimbursement assessments and appeal fees that Visa wrongfully imposed on and collected from Fifth Third Bank ("Fifth Third"), and that Fifth Third in turn collected from Sally Beauty pursuant to Sally Beauty's contractual obligation to indemnify Fifth Third against such wrongful assessments. The Complaint also seeks to recover incidental damages incurred directly by Sally Beauty, or incurred by Fifth Third and indemnified by Sally Beauty, as a result of Visa's wrongful conduct in imposing and collecting the issuer reimbursement assessments. Visa breached its contract with Fifth Third and violated applicable law by imposing and collecting the issuer reimbursement assessments, because the issuer reimbursement assessments are not authorized by the Visa rules in effect at the time of the inception of the data security breach that is the subject of the Complaint, which are incorporated into the agreement between Visa and Fifth Third, and in any event constitute unenforceable penalties for breach of contract. As its basis for recovering the amounts sought by the Complaint, Sally Beauty asserts

claims for breach of contract and breach of the implied covenant of good faith in its capacity as assignee and subrogee to Fifth Third's rights against Visa.  Sally Beauty also asserts claims for money had and received/unjust enrichment (alternatively to the breach of contract claim, against Visa directly and indirectly through Fifth Third), and violations of California Business and Professional Code § 17200 (against Visa directly and indirectly through Fifth Third).

**PARTIES**

2.     Plaintiff Sally Beauty is a Delaware corporation with its principal place of business at 3001 Colorado Boulevard, Denton, Texas 76210. Sally Beauty is an international specialty retailer and distributor of professional hair care and color products, nail polish and accessories, and beauty supplies.

3.     Defendant Visa is a Delaware corporation and may be served with process through its registered agent for service:  The Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.  Visa operates a payment network pursuant to which Visa contracts with financial institutions (like Fifth Third) for the purpose of enabling those institutions to offer their customers (cardholders and merchants, like Sally Beauty) the ability to conduct payment transactions by means of credit and debit cards (jointly, "payment cards") bearing the Visa logo.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds, exclusive of interest and costs, $75,000, and is not between citizens of the same state.

5.     Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**I.**　　**The Visa Payment Network**

6.　　Visa operates a payment card network. Every financial institution that would like to participate in the network (referred to as "Members") must enter into contracts with Visa for the authority to offer consumers and merchants access to Visa's network. An "Issuer" Member is authorized to offer cardholders (by contract) the ability to use Visa-branded payment cards to make payment transactions. An "Acquirer" Member is authorized to offer merchants (again, by contract) the ability to accept Visa-branded payment cards in payment for transactions. An Acquirer often contractually delegates this authority to a non-Member entity called a "Processor."

7.　　The licensing agreement between Visa and each Member incorporates, *inter alia*, the *Visa Core Rules and Visa Product and Service Rules*, which in turn incorporates the *Visa Global Compromised Account Recovery Guide* (the "*Visa Rules*").

8.　　There is a funds flow within the Visa network to settle transactions. The Acquirer pays a participating merchant the dollar amount of all Visa-branded payment card transactions made by cardholders with that merchant (minus applicable fees). The Acquirer in turn collects the transaction amount from Visa (this time, minus a per-transaction "interchange fee"). Visa in turn collects the transaction amount back from the relevant Visa Issuers (and pays them a portion of the interchange fee). The Issuers then collect the amount back from the Visa cardholders who made the transactions in question with the participating merchant. A diagram of this network is attached as Exhibit 1.

**II.**　　**The Payment Card Industry Data Security Standards**

9.　　The *Visa Rules* require all Acquirers to cause their merchants to comply with the Payment Card Industry Data Security Standards ("PCI DSS"). The PCI DSS is a set of data security requirements developed by the payment brands (including Visa) through the Payment Card

Industry Security Standards Council, an organization founded by the payment brands (including Visa).

10.    The PCI DSS include twelve overarching security requirements, each of which is split into numerous security sub-requirements, for a total of over 200 security sub-requirements. The purported intent of the PCI DSS, according to the payment brands, is to protect payment card account data (such as account number, expiration date, and verification codes embedded in a payment card's magnetic stripe and printed on the back of the card).

11.    The PCI DSS requirements and sub-requirements apply to all "system components" of any entity that is subject to the PCI DSS. "System components" are defined as any network component, server, or application that is included in or connected to the "cardholder data environment." The cardholder data environment is comprised of people, processes, and technology that store, process, or transmit cardholder data or sensitive authentication data on behalf of an entity. Other portions of a merchant's computer network are not part of the cardholder data environment and are thus not system components. An entity that is subject to the PCI DSS thus may reduce the scope of its PCI DSS compliance obligation by segmenting its network to limit the "system components" within the entity's network that are included in or connected to the entity's "cardholder data environment" and that, accordingly, are subject to the PCI DSS.

## III.    Visa's Global Compromised Account Recovery Program

12.    In the event an Acquirer's merchant suffers a data security breach involving its cardholder data environment, the *Visa Rules* set forth a purported contractual mechanism for investigating the breach and assessing liability on the merchant for losses suffered by Issuers resulting from that security breach.

13.    Visa defines the requirements regarding the use of investigators and the disclosure, investigation, and resolution of security issues.

14.     The *Visa Rules* require an Acquirer to immediately notify Visa of certain data security breaches or potential data security breaches identified at the Acquirer's merchant.

15.     If requested by Visa, the *Visa Rules* require the Acquirer to retain, or to cause its merchant to retain, a forensic investigator (often referred to as a "Payment Card Industry Forensic Investigator" or "PFI") to conduct "Visa's investigation" of the breach and report its findings to Visa. The investigator must come from a list of investigators that have been pre-approved by Visa and the other payment brands through the Payment Card Industry Forensic Investigator Program. To become a certified investigator under the program, a company must undergo a detailed approval process.  Under the terms of the *Visa Rules*, the certified investigator for a particular data security breach must be "independent" from both Visa and the merchant that suffered the breach.

16.     The *Visa Rules* also specify a mechanism for, once the payment brand's investigation is complete, (a) determining whether an Account Data Compromise Event has occurred and, if so, whether the merchant in question (and hence its Acquirer) bears responsibility for that event; (b) determining the counterfeit fraud losses and operating expenses that Visa Issuers incurred as a result of the event, and (c) collecting the contractually specified portion of those losses from the Acquirer in question.

17.     Under the *Visa Rules*, not every data security breach involving a merchant's cardholder data environment is eligible for an assessment. As relevant here, only particular Visa accounts meeting the following criteria are eligible for an assessment.

    a.     *First*, under the *Visa Rules*, in order for any individual Visa account to qualify for liability under the *Visa Global Compromised Account Recovery Guide* ("GCAR liability"), that account must be included in either an Internet-Related Compromise ("IC") or Research and Analysis ("RA") CAMS Alert. Whether an account is includible in an IC

or RA CAMS Alert, and in turn may be found eligible for GCAR liability, depends on the existence of forensic evidence showing that data as to that particular account was actually compromised. The *Visa Rules* also require that Visa find that 30,000 or more eligible accounts were sent in IC or RA CAMS alerts.

   b.   *Second*, the *Visa Rules* require that Visa find that Account Number and card verification value ("CVV") magnetic-stripe data are actually exposed to unauthorized access or disclosure.

   c.   *Third*, the *Visa Rules* require that any assessment compensate Issuers for their actual losses.

   d.   *Fourth*, the *Visa Rules* require that Visa find a violation of PCI DSS has occurred that could have allowed Account Number and CVV magnetic-stripe data for a particular account to be compromised.

For Visa accounts that meet these criteria, an Acquirer's potential liability to Visa includes, *inter alia*, two components: Incremental Counterfeit Fraud Recovery ("GCAR Fraud Recovery") and Operating Expense Recovery ("GCAR Operating Expense Recovery" and, together with the GCAR Fraud Recovery "GCAR Liability").

   18.   GCAR Fraud Recovery is purported contractual liability to Visa for a portion of counterfeit fraud losses incurred by Issuers as a result of a magnetic-stripe-data Account Data Compromise Event suffered by one of the Acquirer's merchants.

   19.   GCAR Operating Expense Recovery is purported contractual liability to Visa for a portion of any actual operating expenses incurred by Visa Issuers as a result of a magnetic-stripe-data Account Data Compromise Event suffered by one of the Acquirer's merchants.

## IV.    The Relationship Among the Parties

20.    Sally Beauty is an international retailer and distributor of salon-quality hair, nail, and beauty supplies. In order to accept Visa-branded payment cards for transactions at its establishments, on or about February 28, 1996, Sally Beauty entered into a Bank Card Merchant Agreement with Fifth Third Bank, as Acquirer, and its Processor (together, "Fifth Third").

21.    The Bank Card Merchant Agreement states that Sally Beauty "shall indemnify, defend, and hold harmless [Fifth Third], and its directors, officers, employees, affiliates and agents from and against all proceedings, claims, losses, damages, demands, liabilities and expenses whatsoever, including all legal and accounting fees and expenses and all collection costs, incurred by [Fifth Third], its directors, officers, employees, affiliates and agents resulting from or arising out of the Services in this Agreement . . . ." It further states that Sally Beauty "agrees to pay [Fifth Third] all then current fees, assessments and penalties as imposed by Visa . . . in connection with the then effective Operating Regulations whether incurred by [Sally Beauty, Fifth Third], its affiliates and/or agents." And it provides that "[i]n the event any fees, fines or penalties resulting from [Sally Beauty's] sales drafts and/or sales transactions are levied against [Fifth Third] and after written notice in accordance with [Fifth Third's] normal operating procedures of such review has been received by [Sally Beauty], [Sally Beauty] shall reimburse [Fifth Third] on demand or [Fifth Third] may, at its sole option, charge [Sally Beauty's] account." Moreover, it states that Fifth Third "may change or add fees and/or charges without notice, and such fees and/or charges shall be immediately payable by [Sally Beauty] when assessed by [Fifth Third]."

## V.    The Intrusion

22.    On May 4, 2015, Sally Beauty provided notice to Visa, through Fifth Third, that it had identified a potential data breach incident (the "Intrusion").

23.     The criminal(s) who perpetrated the Intrusion attempted to take advantage of a particular feature of the PCI DSS security protocols. At the time of the Intrusion, most payment card transactions were initiated by means of the cardholder's payment card being "swiped" at the point of sale (a "mag-stripe-swipe transaction"). Today this process is less common, but it still occurs with regularity. During the transaction authorization process for a mag-stripe-swipe transaction, certain payment card account data embedded in the card's magnetic stripe (including the account number, the card's expiration date, and—most importantly—the card's Card Verification Value) is electronically transmitted from the merchant to its Acquirer, and then from the Acquirer to the payment brand (*e.g.*, Visa), and then from the payment brand to the Issuer, so that the Issuer can determine whether or not to approve the transaction.

24.     During the Intrusion, the criminal(s) installed malicious computer software at Sally Beauty stores designed to capture mag-stripe-swipe transaction payment data.  However, the malware did not have the ability to export captured payment card data automatically, nor was there any evidence that the attackers exported the data manually.

**VI.     The SecurityMetrics Investigation and Visa's Influence**

25.     In response to a request from the payment brands, including Visa, Sally Beauty engaged SecurityMetrics as the Payment Card Industry Forensic Investigator to conduct an investigation of the Intrusion on behalf of the payment brands, including Visa.

26.     SecurityMetrics issued its Card Compromise Final Incident Report (the "Final PFI Report") on November 25, 2015. In the Final PFI Report, SecurityMetrics concluded that the Intrusion was not caused by a violation of the PCI DSS by Sally Beauty.

27.     Subsequently, however, the card brands, including Visa, demanded that SecurityMetrics re-open its investigation to identify a cause of the Intrusion. SecurityMetrics then issued a Card Compromise Amended Final Report (the "Revised Final PFI Report"), dated May 6,

2016, and a Card Compromise Amended Final Incident Report For Incidents Identified March 2015 Through April 2015 (the "Re-Revised Final PFI Report" and, together with the "Final PFI Report" and "Revised Final PFI Report," the "PFI Reports"), dated July 6, 2016, regarding its investigation of Intrusion.

28.     In the Revised Final PFI Report, SecurityMetrics identified a "cause" of the Intrusion but still did not conclude that the Intrusion had been caused by a PCI DSS requirement being not "in place."

29.     After secret discussions occurred between the card brands, including Visa, and the supposedly "independent" SecurityMetrics, without Fifth Third or Sally Beauty participating in or being given any notice of such discussions, SecurityMetrics issued the Re-Revised Report, which for the first time included a finding that the Intrusion had been caused by a violation of the PCI DSS.

30.     Based on information provided to it by SecurityMetrics, Visa issued alerts to its Issuers with respect to 2,115,157 unique accounts (collectively, the "Alerted-On Accounts"), even though there was no forensic evidence that any of the Alerted-On Accounts had been compromised as a result of the Intrusion.

## VII.    The GCAR Liability Assessments

31.     By letter dated March 23, 2017, Visa notified Fifth Third that Visa had determined that the Intrusion "may qualify for liability assessment under Visa's Global Compromise Account Recovery ('GCAR') program." Visa also stated that "after the fraud reporting and chargeback windows have closed, Visa will determine if the case meets all of the predetermined qualification requirements."

32.     By letter dated July 11, 2018, which enclosed an Event Qualification Summary (the "Qualification Summary"), Visa notified Fifth Third that Visa's "Global Compromised Account

Recovery ('GCAR') Review Team has reviewed documentation and facts of the Account Data Compromise Event related to Sally Beauty Supply LLC and has determined that it meets all of the criteria set forth by the GCAR rules, and is therefore eligible for assessment."

33.     In the Qualification Summary, Visa took the position that all of the 2,115,157 Alerted-On Accounts in connection with the Intrusion (the "Assessed Accounts") qualified for an assessment of $9,006,847.86 in GCAR Incremental Fraud Liability and $5,287,892.50 in GCAR Operating Expense Liability for a total assessment of $14,294,740.36 (collectively, the "GCAR Liability Assessments").

34.     By letter dated August 13, 2018, Fifth Third filed with Visa an appeal that set forth the reasons why the GCAR Liability Assessments were invalid and unlawful, and alternatively requesting that Visa exercise its discretion to reduce the amount of the GCAR Liability Assessments.

35.     On or about October 23, 2018, Visa staff members provided a response to Fifth Third's appeal.

36.     By letter dated November 7, 2018, Fifth Third filed with Visa a reply to the Visa staff members' response.

37.     Visa staff members provided a response to Fifth Third's reply on or around November 13, 2018.

38.     On or about December 17, 2018, Visa notified Fifth Third that it had denied the appeal and would be imposing the full amount of the GCAR Liability Assessments.

39.     Visa also imposed on Fifth Third a $50,000 appeal fee (the "Appeal Fee," which when added together with the GCAR Liability Assessments will hereinafter be referred to as the "Assessments").

40.     On January 15, 2019, Visa debited the amount of the Assessments from Fifth Third.

41.     Effective August 29, 2018, Sally Beauty and Fifth Third entered into an agreement (the "Fifth Third Assignment Agreement") in which the parties agreed that, in the event any portion of the Assessments is collected from Fifth Third by Visa, Sally Beauty has an obligation under the Bank Card Merchant Agreement to reimburse Fifth Third for the collected portion of the Assessment, whether or not the Assessment was validly imposed on and/or collected from Fifth Third under the operating regulations of Visa or under the relevant applicable law.

42.     The Fifth Third Assignment Agreement further provided that, in the event Fifth Third collects from Sally Beauty, in whole or partial satisfaction of Sally Beauty's reimbursement obligation under the Bank Card Merchant Agreement, any reimbursement of the amount of any portion of the Assessment that has been collected from Fifth Third by Visa, such collection of such reimbursement by Fifth Third "shall fully and irrevocably subrogate Sally Beauty to, and shall constitute and be deemed to operate as a full and irrevocable assignment, transfer, and conveyance by Fifth Third to Sally Beauty of, any and all rights, claims, or causes of actions that Fifth Third may have against Visa to obtain reimbursement of any portion of the Assessment that has been collected from Fifth Third by Visa."

43.     Beginning on January 18, 2019, pursuant to the Fifth Third Assignment Agreement, over the course of fifteen days, Fifth Third debited the amount of the Assessments from settlement funds otherwise owed to Sally Beauty.

## VIII.  The GCAR Liability Assessments Are Invalid Because There Is No Forensic Evidence of Compromise Sufficient to Support Inclusion of Any Assessed Account in an IC or RA CAMS Alert

44.     Under the *Visa Rules*, in order for any individual Visa account to qualify for GCAR liability, that account must be included in either an Internet-Related Compromise ("IC") or Research and Analysis ("RA") CAMS Alert. Whether an account is includible in an IC or RA

Alert, and in turn may be found eligible for GCAR liability, depends on the existence of forensic evidence showing that data as to that particular account was actually compromised.

45.     Visa did not show (and indeed could not even reasonably have concluded), and in any event it was not the case, that Sally Beauty suffered a theft of cardholder data with respect to all of the Alerted-On Accounts used to conduct a Visa transaction at Sally Beauty that Visa found to be includible in an IC or RA CAMS Alert, and therefore eligible for GCAR, (or for that matter even with respect to any particular Alerted-On Account that Visa found to be so eligible).

46.     In particular, there is no forensic evidence showing that any individual Assessed Account (let alone all of them) was compromised during the Intrusion and thus no basis exists for including any of the Assessed Accounts (much less all of them) in an IC or RA alert or for in turn finding any (much less all) of the Assessed Accounts eligible for GCAR liability. Visa premised its qualification of the Assessed Accounts for GCAR Liability entirely on the Re-Revised Final PFI Report. The Re-Revised Final PFI Report, however, provides no forensic information indicating a compromise as to any of the Assessed Accounts. To the contrary, SecurityMetrics found that the malware did not have the ability to export captured payment card data automatically, either in real time or at scheduled intervals, and found no hint of exfiltration.  Thus, the Re-Revised PFI Report does not support any conclusion by Visa that there was forensic information indicating a compromise sufficient to qualify any particular Assessed Account (let alone all of them) for GCAR liability.

47.     The GCAR Liability Assessments thus violated the *Visa Rules* because all (or at a minimum some) of the Alerted-On Accounts on which the GCAR Liability Assessments were based were ineligible for the Assessments.

IX.    **The GCAR Liability Assessments Are Invalid Because Visa Has No Basis for Concluding that an Account Data Compromise Event Occurred with Respect to Any (and Certainly Not All) of the Accounts**

48.    Under the *GCAR Guide*, Visa may only invoke the GCAR assessment process for an individual Visa account where (a) Account Number and CVV magnetic-stripe data is exposed to unauthorized access or disclosure and (b) there were a minimum of 30,000 unique Visa accounts "exposed" to unauthorized access or disclosure.

49.    Visa did not show (and indeed could not even reasonably have concluded), and in any event it was not the case, that Account Number and CVV magnetic-stripe data was exposed to unauthorized access or disclosure for all of the Alerted-On Accounts that Visa found eligible for the GCAR assessment process (or for that matter even with respect to any particular Alerted-On Account that Visa found to be so eligible).

50.    Moreover, Visa did not show (and indeed could not even reasonably have concluded), and in any event it was not the case, that there were a minimum of 30,000 Alerted-On Accounts associated with the Intrusion that were eligible for the GCAR assessment process.

51.    In particular, the Re-Revised PFI Report does not support the conclusion that any Account Number and CVV magnetic stripe data were "exposed" as a result of the Intrusion, let alone that at least 30,000 unique Visa Accounts were exposed in the Intrusion. In the Re-Revised PFI Report, SecurityMetrics opined that (i) the malware was installed at different locations on different dates between March 8, 2015 and April 15, 2015, (ii) the malware did not have the ability to export captured payment card data automatically, either in real time or at scheduled intervals, (iii) the attackers would have had to collect any output files manually, and (iv) SecurityMetrics did not observe any evidence of such manual collection.

52.    There is no evidence that any file containing any Visa account data was later transferred out of the network (and thus no evidence of actual access or disclosure). That being the

case, in order for Visa to have validly concluded that data as to all of the Assessed Accounts were "exposed" as a result of the Intrusion, Visa would have had to validly conclude that (i) data relative to each Assessed Account was captured by the malware and stored in an output file on that particular terminal, and (ii) there was nothing preventing the data in such file from being later "accessed" by or "disclosed" to the attackers (*i.e.* transferred out of the network).

53.    The Re-Revised PFI Report, however, states that the malware did not have the ability to automatically export any of the local output files, and SecurityMetrics did not observe any evidence of manual exfiltration or, in the absence of such evidence, that such extraction more likely than not occurred as to all of the Assessed Accounts captured and stored in output files by the malware. Indeed, the Re-Revised PFI Report does not include any statement about the likelihood, let alone possibility, of such manual access by the attackers.

54.    The GCAR Liability Assessments thus violated the *Visa Rules* because all (or at a minimum some) of the Alerted-On Accounts on which the GCAR Liability Assessments were based were ineligible for assessing.

## X.    The GCAR Liability Assessments Are Invalid Because They Are Not Based on Losses Actually Incurred by Visa Issuers by Reason of the Intrusion

55.    Under the *Visa Rules*, GCAR Fraud Recovery and GCAR Operating Expense Recovery must also reflect losses actually incurred by Visa Issuers as a result of the Intrusion.

56.    In determining whether a group of accounts is eligible for GCAR Fraud Recovery, Visa is required to compare the actual amount of counterfeit fraud on the accounts in question during the "Fraud Window" against the expected or "baseline" level of counterfeit fraud on those accounts during that period, with any excess of the actual level over the "baseline" level being deemed to be "incremental counterfeit fraud" for which GCAR liability potentially may be assessed. Here, however, in calculating the "baseline" counterfeit fraud level for the Assessed

Accounts as to any given Visa Issuer, Visa assumed that the Assessed Accounts issued by any particular Visa Issuer constitute a statistically perfect random sample of all other Visa accounts issued by the Issuer, thus permitting Visa reasonably to conclude that the baseline counterfeit fraud level is the same for the Issuer's Assessed Accounts as it is for all other Visa accounts issued by the Issuer. However, neither the Qualification Summary provided by Visa nor the *Visa Rules* offers any basis for this crucial assumption. Moreover, there are many reasons to doubt the validity of this assumption. In particular, it is possible that the holders of the Assessed Accounts, compared to other Visa account holders, are relatively more susceptible to counterfeit fraud than they are to stolen-card fraud and card-not-present fraud, because on dimensions like income, number, and dollar amounts of monthly credit-card purchases, type of merchants patronized, place of residence, age, gender, and ethnicity, the holders of the Assessed Accounts may differ appreciably from the full set of Visa account holders.

57.    As a result, the methodology that Visa used to calculate the level of "baseline" counterfeit fraud (and thereby the level of incremental counterfeit fraud) on the Assessed Accounts is not a statistically reliable methodology for calculating the amount of counterfeit fraud that would have been expected to have been reported on the Assessed Accounts in the absence of the Intrusion. Visa's determination of the level of incremental counterfeit fraud on the Assessed Accounts, being based entirely on its statistically flawed baseline counterfeit fraud determination, is therefore likewise statistically flawed. Because the levels of baseline counterfeit fraud and incremental fraud calculated by Visa with respect to the Assessed Accounts were not determined in a statistically reliable manner, Visa violated the *Visa Rules* in determining the amount of the GCAR Fraud Recovery portion of the GCAR Liability Assessments, as it made that determination by means of a methodology that did not operate to ensure that any counterfeit fraud recovery with respect to

the Assessed Accounts would be strictly limited to those Member counterfeit fraud losses "resulting from" the Account Data Compromise Event in question.

58.    The Visa staff's calculation of Operating Expense Recovery is also flawed, because it included expenses that were not actually suffered by Members as a result of the Intrusion. As reflected in its Qualification Summary, Visa calculated the operating expense portion of the GCAR Liability Assessments simply by multiplying the number of Assessed Accounts by $2.50. In other words, Visa made no effort in calculating the operating expense portion of the Assessment to determine whether any given Issuer had actually incurred at least $2.50 in non-ordinary course operating expenses as to each of the Issuer's Assessed Accounts as a result of the Intrusion. Indeed, Visa made no effort in this regard to determine whether any Visa Issuer actually incurred any expenses *at all* as to its Assessed Accounts by reason of the Intrusion. Thus, Visa's calculation of the operating expense portion of the Assessment directly conflicts with the portion of the *Visa Rules* that limits GCAR operating expense liability and recovery to actual non-ordinary course operating expenses "resulting from" an Account Data Compromise Event.

59.    The GCAR Liability Assessments thus violated the *Visa Rules* because the particular Alerted-On Accounts that Visa found to be eligible for the GCAR assessment process did not incur, as a group, any amount of incremental counterfeit fraud within the meaning of the *Visa Rules* and because Visa's Issuers did not incur any amount of operating expenses (much less operating expenses in an amount at least equal to the amount of the GCAR Operating Expense Recovery portion of the GCAR Liability Assessments) by reason of the Alerted-On Accounts that Visa found to be eligible for the GCAR assessment process.

**XI.    The GCAR Liability Assessments Are Invalid Because Visa Has No Basis for Concluding that Sally Beauty Violated the PCI DSS in a Manner that Could Have Allowed a Compromise of Any of the Assessed Accounts**

60.    Under the *Visa Rules* and the *GCAR Guide*, an account will only qualify for the GCAR Assessment process if a violation of PCI DSS has occurred that could have allowed Account Number and CVV magnetic-stripe data for that account to be compromised.

61.    Here, Visa did not show (and indeed could not even reasonably have concluded), and in any event it was not the case, that Sally Beauty failed to comply with the PCI DSS in a manner that allowed the theft of cardholder data with respect to all the Alerted-On Accounts that Visa found to be eligible for the GCAR assessment process (or for that matter even with respect to any particular Alerted-On Account that Visa found to be so eligible).

62.    As an initial matter, the *Visa Rules* require that a Merchant like Sally Beauty file every year a Report on Compliance ("ROC") prepared by a Qualified Security Assessor ("QSA") (or Internal Auditor if signed by officer of the company) verifying that the Merchant has validated compliance with the PCI DSS. On November 6, 2014, approximately four months prior to the Intrusion, AT&T, Sally Beauty's QSA, issued a Report on Compliance which found all applicable requirements "in place." Visa cannot now contend, based on a conflicting finding of the PFI, that the original assessment by its QSA was incorrect.

63.    Even if Visa was entitled to reevaluate its QSA's determinations regarding PCI compliance, Visa would have no basis for finding that a PCI DSS violation occurred that could have allowed a compromise of the Assessed Accounts. In initially imposing the GCAR Liability Assessments, as described in the Qualification Summary, Visa sought to rely *only* on the finding that Requirement 1 was not in place. Visa based its conclusion that Sally Beauty was not compliant with the PCI DSS on the findings of SecurityMetrics in its Re-Revised Final PFI Report. However, that conclusion was not based on SecurityMetric's independent assessment, but rather as a result

of demands by the card brands, including Visa. In the Final PFI Report originally issued by SecurityMetrics on November 25, 2015, SecurityMetrics found that it could not conclude that *any* of the alleged PCI DSS violations caused or contributed to the Intrusion.

64.    Even if Visa could rely on findings in subsequent versions of the Final PFI Report, which were not the result of independent conclusions by the PFI, those findings would not support Visa's issuance of the GCAR Liability Assessments. The only PCI DSS requirements that SecurityMetrics concluded in either the Revised Final PFI Report or the Re-Revised Final PFI Report were not in place were sub-requirements 1.2.1, 2.2.2.b, and 10.2, and Visa initially limited its contention that an alleged violation could have allowed a compromise only to the finding as to sub-requirement 1.2.1. SecurityMetrics' conclusions were not accurate (nor, as to sub-requirements 1.2.1 and 2.2.2.b, independent). Accordingly, any effort by Visa to premise the Assessments on those findings would be contrary to the Rules.

65.    In regard to sub-requirement 1.2.1, the Final PFI Report and the Revised Final PFI Report both found Sally Beauty in compliance with the sub-requirement. In the Re-Revised Report, however, in response to coercion from the card brands, including Visa, SecurityMetrics found that Sally Beauty's allowing certain corporate systems to access the CDE ("Cardholder Data Environment") through a particular protocol without particular firewall restrictions was a violation of Requirement 1.2.1. But Requirement 1.2.1 in fact applies only to connections "between *untrusted* networks and system components in the cardholder data environment" (emphasis added). It defines an "untrusted network" as "any network that is *external to the networks belonging to the entity under review,* and/or which is out of the entity's ability to control or manage" (emphasis added). The corporate systems in question identified by SecurityMetrics as having access to the CDE in a manner that violated Requirement 1.2.1 were all systems within

Sally Beauty's trusted, corporate environment that, as such, both belong to Sally Beauty and are within Sally Beauty's ability to manage and control. Sub-Requirement 1.2.1, therefore, is not applicable to the firewall settings in place between those systems and the CDE. The Re-Revised Final PFI Report's coerced finding of a violation of Requirement 1.2.1 was, therefore, erroneous.

66.     In regard to "Requirement" "2.2.2.b," as a threshold matter, this Requirement does not exist. Rather, it is a testing procedure applicable only to assessors, not Sally Beauty. SecurityMetrics' finding on this Requirement is erroneous for that reason alone. In any event, SecurityMetrics' finding that Requirement 2 was "not in place" at the time of the Intrusion due to Sally Beauty's use of a particular protocol was erroneous. Sub-Requirement 2.2.2 does not prohibit the use of the protocol in question between trusted networks and the CDE, so long as there is a business need for the protocol and there are security features in place as to the protocol. Here, the Re-Revised Final PFI Report itself acknowledged that there was a business need for the protocol. Moreover, Sally Beauty had appropriate measures in place to secure the protocol. Thus, there was no violation of the Requirement.   In regard to causation, despite earlier concluding in the Qualification Summary that the violation of Requirement 2 alleged in the Re-Revised Final PFI Report *did not* allow a compromise of cardholder data, the Visa staff reversed course during the appeals process and contended that it did. However, Visa was bound by its earlier determination, and so this 11th-hour conversion was invalid. Moreover, Visa's initial conclusion that causation was lacking was correct. The Final PFI Report made no finding that this alleged PCI DSS violation caused or contributed to the Intrusion. Rather, it was not until it was coerced by the card brands, including Visa, into issuing the Revised Final PFI Report and the Re-Revised Final PFI Report that SecurityMetrics first found that the alleged sub-requirement 2.2.2 violation allegedly "contributed to" the Intrusion.  This coerced finding was incorrect. As acknowledged by Visa in

the Qualification Summary, any purported violation of sub-requirement 2.2.2 could not have "contributed to" the Intrusion. Indeed, as confirmed by SecurityMetrics, the intruder did not even use the protocol in question to access the CDE, and in any event the technologies listed in the Re-Revised Final PFI Report that might have been used to secure the protocol would not have prevented such access.

67.     Moreover, because the Re-Revised Final PFI Report's findings regarding sub-requirements 1.2.1 and 2.2.2.b were not made as part of an "independent" PFI investigation as required by the *Visa Rules*, but rather were the product of coercion by Visa, Visa may not rely on those findings as the basis for imposing the GCAR Liability Assessments.

68.     In regard to sub-requirement 10.2, the Re-Revised Final PFI Report found that sub-requirement 10.2 was not "in place," but also found that the purported violation did not cause or contribute to the breach. Because the Re-Revised Final PFI Report found no causation, sub-requirement 10.2 cannot support Visa's imposition of the Assessments, and Visa does not claim it does. In any event, the Re-Revised Final PFI Report's conclusion that Sally Beauty violated sub-requirement 10.2, which requires the logging of certain events, was erroneous. Sally Beauty performed all of the logging required by that sub-requirement.

69.     Because Visa had no basis to find a violation of PCI DSS has occurred that could have allowed Account Number and CVV magnetic-stripe data for that account to be compromised, the GCAR Liability Assessment is in violation of the Rules.

## XII.   The GCAR Liability Assessments Are Unenforceable as a Matter of Law

70.     In any event, the GCAR Liability Assessments would be legally unenforceable even if they were valid under the *Visa Rules*. First, under the *Visa Rules*, Visa purports to reserve total unfettered discretion unto itself in determining, in calculating the amount of, and in deciding whether or not to collect, any assessments. Because there is, as a result, no mutuality of obligation

between Visa, on the one hand, and Visa's Members, on the other, the *Visa Rules* are not supported by consideration and are unenforceable as illusory promises.

71.    Moreover, the GCAR Liability Assessments constitute a penalty—rather than damages—for Fifth Third allegedly having breached its contract with Visa, and as such they are legally unenforceable under applicable law. Visa does not even pretend that the GCAR Liability Assessments represent the actual damages of Visa itself by reason of Fifth Third's alleged breaches of its contractual obligation to cause Sally Beauty to comply with the requirements of the PCI DSS. To the contrary, by the *Visa Rules*' very terms, the GCAR Liability Assessments purport to constitute losses that Visa's Members incurred by reason of Fifth Third's alleged violations of its contractual obligation to Visa.

72.    But Visa's Members are not parties to or third-party beneficiaries of the contracts between Fifth Third and Visa, so Fifth Third can have no breach-of-contract liability under those agreements for damages suffered by those Issuers. And even if it could have such liability, the *Visa Rules'* provisions for assessments do not purport to calculate the losses that Visa Issuers actually incur by reason of an Account Data Compromise Event that results from a merchant's failure to be PCI DSS compliant—meaning that any liability arising under those provisions could only be sustained if the provisions were valid liquidated damages provisions.

73.    The *Visa Rules*' provisions for the GCAR Liability Assessments are not valid liquidated damages provisions, however, because (1) the GCAR Liability Assessments are not intended to be compensatory damages for losses incurred by Visa by reason of an Acquirer's failure to ensure its merchants' PCI DSS compliance, but rather is intended to compensate Visa's Issuers, who are not parties to or third-party beneficiaries of an Acquirer's contract with Visa; (2) the *Visa Rules* purport to afford Visa unbounded discretion to determine the imposition and

calculate the amount of the GCAR Liability Assessments; (3) the amount of any losses that Visa and/or its Issuers may actually incur by reason of an Acquirer's failure to ensure its merchants' PCI DSS compliance is not only reasonably estimable, but calculable to the penny, to the extent they incurred any such losses at all; and (4) the GCAR Liability Assessments are not Visa's exclusive damages remedy by reason of an Acquirer's failure to ensure its merchants' PCI DSS compliance. Because the GCAR Liability Assessments cannot be sustained as a valid award of either actual or liquidated damages by reason of Fifth Third's alleged breaches of its contractual obligation to Visa to cause Sally Beauty to comply with the PCI DSS, all Assessments necessarily constitute a penalty by reason of such alleged breaches, and as such are unenforceable under applicable law regardless of whether they comport with the *Visa Rules* (which they do not).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Breach of Contract
#### (As Assignee and Subrogee of Fifth Third)

74.     Sally Beauty repeats and incorporates by reference each and every allegation set forth herein.

75.     A valid contract exists between Fifth Third and Visa under which Visa was, and is, bound to comply with the *Visa Rules* and *GCAR Guide*.

76.     Fifth Third has fully performed its obligations under its contract with Visa.

77.     Any conditions precedent to Visa's performance under its contract with Fifth Third have occurred.

78.     Visa was contractually obligated under the *Visa Rules* to pay Fifth Third the amounts it withheld from Fifth Third in satisfaction of the Assessments.

79.     Only if the Assessments were both authorized by the *Visa Rules* and enforceable under applicable law would Visa have been authorized to collect the Assessments by withholding the funds otherwise owed to Fifth Third.

80.     The Assessments were not authorized by the *Visa Rules*.

81.     The Assessments, even if they were authorized by the *Visa Rules* (they were not), are unenforceable under applicable law because they constitute a contractual penalty for Fifth Third's alleged breaches of its contract with Visa.

82.     By imposing the Assessments on, and collecting the Assessments from, Fifth Third, Visa breached its contractual obligation to comply with the *Visa Rules*.

83.     Visa was (and is) therefore liable to Fifth Third for the amount of the Assessments.

84.     Sally Beauty was obligated to indemnify Fifth Third, and pursuant to such indemnification obligation Sally Beauty reimbursed Fifth Third, for the Assessments, even though such collection was unlawful on Visa's part.

85.     Fifth Third assigned to Sally Beauty any and all rights, claims, or causes of actions that Fifth Third may have against Visa to obtain reimbursement of any portion of the Assessments.

86.     Because Sally Beauty paid Fifth Third the amount of the Assessments pursuant to a legal indemnity obligation, it was not a volunteer.

87.     As a result of its payment to Fifth Third of an amount primarily owed to Fifth Third by Visa, Sally Beauty has also become equitably subrogated to Fifth Third's right of recovery against Visa of the Assessments.

88.     Accordingly, Sally Beauty is entitled to damages in amounts to be determined at trial, but not less than the full amount of the Assessments together with any amounts incidental to

the Assessments that Sally Beauty has in turn paid pursuant to its indemnity obligation to Fifth Third.

89.     Sally Beauty also seeks its attorney's fees under Texas Civil Practice & Remedies Code § 38.001(8).

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
(As Assignee and Subrogee of Fifth Third)

90.     Sally Beauty repeats and incorporates by reference each and every allegation set forth herein.

91.     A valid contract exists between Fifth Third and Visa under which Visa was, and is, bound to comply with the *Visa Rules*.

92.     Fifth Third has fully performed its obligations under its contract with Visa.

93.     Any conditions precedent to Visa's performance under its contract with Fifth Third have occurred.

94.     Visa was contractually obligated under the *Visa Rules* to pay Fifth Third  the amounts it collected from Fifth Third in satisfaction of the Assessments.

95.     Only if the Assessments were authorized by the *Visa Rules* and enforceable under applicable law would Visa have been authorized to collect the Assessments from Fifth Third.

96.     The Assessments were not authorized by the *Visa Rules* or applicable law.

97.     The *Visa Rules* purport to empower Visa with the right to unilaterally determine the rights of Visa and obligations of Visa Members under certain aspects of the *Visa Rules* including, without limitation, certain aspects relating to the imposition and amount of GCAR Operating Expense Recovery or GCAR Fraud Recovery. To the extent the *Visa Rules* purport to grant Visa the unilateral discretion to determine the rights and obligations of Visa and Fifth Third respectively under the *Visa Rules* regarding any aspect of Visa's imposition and/or collection of

the Assessments, those provisions are unenforceable as a matter of law. However, to the extent any of those provisions are found to be enforceable to any extent (which they are not), Visa acted unfairly and without good faith by the manner in which it exercised such discretion in imposing the Assessments against Fifth Third and collecting the Assessments from Fifth Third, and by doing so deprived Fifth Third of the benefits of its contract with Visa. Thus, Visa violated the implied covenant of good faith and fair dealing.

98.     Visa was (and is) therefore liable to Fifth Third for the amount of the Assessments.

99.     Visa, in equity and good conscience, should discharge that liability. It is primarily answerable to Fifth Third for the amounts of the Assessments.

100.    Sally Beauty was obligated to indemnify Fifth Third, and pursuant to such indemnification obligation Sally Beauty reimbursed Fifth Third, for the Assessments, even though such collection was unlawful on Visa's part.

101.    Fifth Third assigned to Sally Beauty any and all rights, claims, or causes of actions that Fifth Third may have against Visa to obtain reimbursement of any portion of the Assessments.

102.    Because Sally Beauty paid Fifth Third the amount of the Assessments pursuant to a legal indemnity obligation, it was not a volunteer.

103.    As a result of its payment to Fifth Third of an amount primarily owed to Fifth Third by Visa, Sally Beauty has also become equitably subrogated to Fifth Third's right of recovery against Visa of the Assessments.

104.    Accordingly, Sally Beauty is entitled to damages in amounts to be determined at trial, but not less than the full amount of the Assessments together with any amounts incidental to the Assessments that Sally Beauty has in turn paid pursuant to its indemnity obligation to Fifth Third.

105.    Sally Beauty also seeks its attorney's fees under Texas Civil Practice & Remedies Code § 38.001(8).

**THIRD CAUSE OF ACTION**
**Money Had and Received or Restitution/Unjust Enrichment**
**(Alternatively to the First Cause of Action) (As Assignee and Subrogee of Fifth Third)**

106.    Sally Beauty repeats and incorporates by reference each and every allegation set forth herein.

107.    By imposing the Assessments on, and by collecting the Assessments from, Fifth Third without any contractual or lawful basis for so doing, Visa was unjustly enriched and received money meant to be used for the benefit of Fifth Third.

108.    By reason of Visa's wrongful imposition and collection of the Assessments, Visa possesses funds that ultimately and rightfully belong to Fifth Third.

109.    To allow Visa to retain such funds when Visa has no right to such funds would go against principles of right, justice, and morality.

110.    Fifth Third is accordingly owed the amounts wrongfully imposed and collected by Visa.

111.    In the alternative, Visa was unjustly enriched by its actions in wrongfully imposing and collecting the Assessments, which violates basic principles of fairness, equity, and good conscience, and requires that Visa make restitution to Fifth Third of the amounts by which Visa has been unjustly enriched at Fifth Third's expense. Visa obtained this benefit through fraud, duress, and the taking of undue advantage, by leveraging its position to unilaterally withhold funds that it knew or should have known it had no right to withhold, and misrepresenting to Fifth Third that it had the authority to do so.

112.    To allow Visa to retain such funds when Visa has no right to such funds would go against principles of right, justice, and morality.

113.   Fifth Third is accordingly owed the amounts wrongfully imposed and collected by Visa.

114.   Sally Beauty was obligated to indemnify Fifth Third, and pursuant to such indemnification obligation Sally Beauty reimbursed Fifth Third, for the Assessments, even though such collection was unlawful on Visa's part.

115.   Fifth Third assigned to Sally Beauty any and all rights, claims, or causes of actions that Fifth Third may have against Visa to obtain reimbursement of any portion of the Assessments.

116.   Because Sally Beauty paid Fifth Third the amount of the Assessments pursuant to a legal indemnity obligation, it was not a volunteer.

117.   As a result of its payment to Fifth Third of an amount primarily owed to Fifth Third by Visa, Sally Beauty has also become equitably subrogated to Fifth Third's right of recovery against Visa of the Assessments.

**FOURTH CAUSE OF ACTION**
**Violation of CAL. BUS. & PROF. CODE § 172000 *et seq.***
**(As Assignee and Subrogee of Fifth Third)**

118.   Sally Beauty repeats and incorporates by reference each and every allegation set forth herein.

119.   Visa is prohibited from engaging in "any unlawful, unfair or fraudulent business act or practice" by California Business and Professional Code § 17200 ("California Unfair Competition Law").   Upon information and belief, Visa drafted the Visa rules at issue in this Complaint in its California offices, held the discussions with Fifth Third regarding Fifth Third becoming a Visa Member from its California offices, engaged in correspondence with Fifth Third and Visa's forensic investigator concerning the data security breach at issue in this Complaint from its California offices, imposed the issuer reimbursement assessments at issue in this Complaint from its California offices, responded to and ruled upon Fifth Third's appeals of those issuer

reimbursement assessments from its California offices, and caused the actual collection of the assessments at issue in this Complaint from its California offices.

120.    To enable consumers to make purchases at merchants using Visa-branded payment cards and to enable merchants to accept Visa-branded payment methods from consumers, Fifth Third must be part of the Visa network.

121.    Visa regularly imposes assessments similar to the Assessments on Acquirers.

122.    To participate in the Visa network, Fifth Third had to agree to the *Visa Rules*.

123.    By imposing and collecting the Assessments, Visa deliberately harmed Fifth Third. Because the Assessments against Fifth Third are invalid under the *Visa Rules* and applicable law, Visa lacks justification for having imposed such harm on Fifth Third and acted unfairly in so doing. Accordingly, Visa's wrongful imposition and collection of the Assessments was an unfair and unlawful business practice as to Fifth Third in violation of the California Unfair Competition Law.

124.    By imposing and collecting the Assessments, Visa misrepresented to Fifth Third that these amounts were due and that Fifth Third owed payment to Visa under the *Visa Rules* and applicable law. Because the Assessments are invalid under the *Visa Rules* and applicable law, the Assessments were a fraudulent, unfair, and unlawful business practice as to Fifth Third in violation of the California Unfair Competition Law.

125.    Visa wrongfully obtained money from Fifth Third in the amount of $14,344,740.36 by engaging in unfair, unlawful, and fraudulent business practices as described above.

126.    Sally Beauty was obligated to indemnify Fifth Third, and pursuant to such indemnification obligation Sally Beauty reimbursed Fifth Third, for the Assessments, even though such collection was unlawful on Visa's part.

127.    Fifth Third assigned to Sally Beauty any and all rights, claims, or causes of actions that Fifth Third may have against Visa to obtain reimbursement of any portion of the Assessments.

128.    Because Sally Beauty paid Fifth Third the amount of the Assessments pursuant to a legal indemnity obligation, it was not a volunteer.

129.    As a result of its payment to Fifth Third of an amount primarily owed to Fifth Third by Visa, Sally Beauty has also become equitably subrogated to Fifth Third's right of recovery against Visa of the Assessments.

130.    Accordingly, Sally Beauty is entitled to damages in amounts to be determined at trial, but not less than the full amount of the Assessments together with any amounts incidental to the Assessments that Sally Beauty has in turn paid pursuant to its indemnity obligation to Fifth Third.

131.    Sally Beauty also seeks its attorney's fees under California Code of Civil Procedure § 1021.5.

**FIFTH CAUSE OF ACTION**
**Money Had and Received or Restitution/Unjust Enrichment**
**(Direct)**

132.    Sally Beauty repeats and incorporates by reference each and every allegation set forth herein.

133.    By imposing the Assessments on, and by collecting the Assessments from, Fifth Third without any contractual or lawful basis for so doing, Visa was unjustly enriched.

134.    Visa regularly imposes assessments similar to the GCAR Liability Assessments on Acquirers and knows or has reason to know that such assessments are regularly passed on to merchants.

135.    Visa knew, or had reason to know, when it imposed the GCAR Liability Assessments on, and collected the Assessments from, Fifth Third, that these amounts reasonably

foreseeably could be reimbursable by Sally Beauty in whole or in part and that Sally Beauty reasonably foreseeably could be the entity that would bear the economic consequences of Visa's unfair, unlawful, and/or fraudulent conduct.

136.    Sally Beauty was obligated to indemnify Fifth Third, and pursuant to such indemnification obligation Sally Beauty reimbursed Fifth Third, for the Assessments, even though such collection was unlawful on Visa's part.  Therefore, the Assessments represent funds in the possession of Visa that rightfully belong to Sally Beauty.

137.    To allow Visa to retain such funds when Visa has no right to such funds would go against principles of right, justice, and morality.

138.    In the alternative, because Sally Beauty was obligated to indemnify Fifth Third, and pursuant to such indemnification obligation Sally Beauty reimbursed Fifth Third, for the Assessments, even though such collection was unlawful on Visa's part, Visa has been unjustly enriched at Sally Beauty's expense by Visa's actions in wrongfully imposing and collecting the Assessments, which violates basic principles of fairness, equity, and good conscience, and requires that Visa make restitution to Sally Beauty of that portion of the Assessments. Visa obtained this benefit through fraud, duress, and the taking of undue advantage, by leveraging its position to unilaterally withhold funds that it knew or should have known it had no right to withhold, and misrepresenting that it had the authority to do so.

139.    To allow Visa to retain the Assessments when Visa had no right to the Assessments would go against principles of right, justice, and morality.

140.    Thus, Sally Beauty has lost money or property and is owed the Assessments by Visa.

141.    Sally Beauty is therefore entitled to recover from Visa an amount to be determined at trial, but not less than the full amount of the Assessments.

## SIXTH CAUSE OF ACTION
### Violation of CAL. BUS. & PROF. CODE § 172000 *et seq.*
### (Direct)

142.    Sally Beauty repeats and incorporates by reference each and every allegation set forth herein.

143.    Visa is prohibited from engaging in "any unlawful, unfair or fraudulent business act or practice" by California Business and Professional Code § 17200.

144.    To enable consumers to make purchases using Visa-branded payment methods, Sally Beauty must be part of the Visa network.

145.    To participate in the Visa network, Sally Beauty had to agree to the *Visa Rules*.

146.    Visa regularly imposes assessments similar to the Assessments on Acquirers and knows or has reason to know that such assessments are regularly passed on to merchants.

147.    Visa knew, or had reason to know, when it imposed and collected the Assessments from Fifth Third, that the amounts of the Assessments reasonably foreseeably could be reimbursable by Sally Beauty in whole or in part and that Sally Beauty reasonably foreseeably could be the entity that would bear the economic consequences of Visa's unlawful, unfair, and fraudulent conduct.

148.    By imposing and collecting the Assessments, Visa deliberately engaged in conduct that it had reason to expect would harm Sally Beauty. Because the Assessments are invalid under the *Visa Rules* and applicable law, Visa lacks justification for having imposed such harm on Sally Beauty and acted unfairly in so doing. Accordingly, Visa's wrongful imposition and collection of the Assessments was an unfair and unlawful business practice as to Sally Beauty in violation of the California Unfair Competition Law.

149.    By imposing and collecting the Assessments, Visa misrepresented to Fifth Third that these amounts were due and that Fifth Third owed payment to Visa under the *Visa Rules* and applicable law. Visa knew, or had reason to know, when it made such misrepresentation, that the amounts of the Assessments reasonably foreseeably could be reimbursable by Sally Beauty in whole or in part and that Sally Beauty reasonably foreseeably could be the entity that would bear the economic consequences of Visa's unlawful, unfair, and fraudulent conduct. Because the Assessments are invalid under the *Visa Rules* and applicable law, imposition of the Assessments was a fraudulent, unfair, and unlawful business practice as to Sally Beauty in violation of the California Unfair Competition Law.

150.    Thus, Visa wrongfully obtained money from Sally Beauty by engaging in unfair, unlawful, and fraudulent practices, and Sally Beauty is accordingly owed these amounts by Visa.

151.    Sally Beauty is therefore entitled to recover from Visa an amount to be determined at trial, but not less than the full amount of the Assessments.

152.    Sally Beauty also seeks its attorney's fees under California Code of Civil Procedure § 1021.5.

## JURY DEMAND

Sally Beauty demands a trial by jury of any and all issues triable of right before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sally Beauty respectfully requests the Court to enter judgment in its favor and against Defendant Visa on the causes of action of this Complaint as follows:

A.      On all Causes of Action, for damages in amounts to be determined at trial, but not less than the full amount of the Assessments, and prejudgment and post-judgment interest in the maximum rate allowed by law;

      B.      On the First, Second, Fourth, and Sixth Causes of Action, for its attorneys' fees;

      C.      On all Causes of Action, for its court costs; and

      D.      For any such other and further relief as this Court deems just and proper.

Dated: April 24, 2019                    Respectfully submitted,

                                    */s/ Claudia Wilson Frost*
                                    Claudia Wilson Frost
                                    State Bar No. 21671300
                                    **ORRICK, HERRINGTON & SUTCLIFFE LLP**
                                    609 Main, 40th Floor
                                    Houston, TX 77002
                                    713.658.6400
                                    713.658.6401 – Fax
                                    cfrost@orrick.com

                                    ATTORNEYS FOR PLAINTIFF